# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NORTH CAROLINA
## CHARLOTTE DIVISION

Sushma Bade,

Case No.: 3:26-cv-436

*Plaintiff,*

**COMPLAINT**

vs.

United States Department of Homeland Security,

*Defendant.*

## INTRODUCTION

It is no secret, the Department of Homeland Security, and its component the United States Citizenship and Immigration Service, move slower than molasses in winter. In the first Trump administration, USCIS's processing of Form I-765 applications to extend employment authorization documents ("EAD") were so long that every applicant was guaranteed to lose authorization and their job prior to final adjudication. USCIS settled a class action lawsuit challenging these delays, and in acknowledgment of its bureaucratic sloth and the harm it had imposed on the affected community, USCIS created an EAD auto extension regulation in 2022. Individuals filing an extension application prior to their current EAD's expiry would be extended up to 540 days while the agency processed their case.

Recently, the agency bypassed notice and comment rulemaking and published an Interim Final Rule ("IFR"), Removal of the Automatic Extension of Employment Authorization Documents, 90 Fed. Reg. 48700 (October 30, 2025), promulgating 8 C.F.R. § 274a.13(d) (2025), which ended EAD auto extension. The emergency cites is a solitary criminal act perpetrated by

1

an individual who benefited from EAD auto extension while their renewal application was pending.

The agency claims that it cannot protect the country from national security threats if it cannot properly vet individuals prior to extending their employment authorization. The agency failed to discuss or consider its Continuous Immigration Vetting ("CIV") and ATLAS programs: both of which provide the agency real time updates without waiting for an adjudication.

The agency's IFR is a thinly concealed pretext attempting to cause maximum damage and pain to the immigrant community. Plaintiff is an H4 visa holder, and dependent spouse of H1B visa holder. Plaintiff is eligible to apply for an EAD. However, the IFR has already forced some out of jobs.

Plaintiff brings this case under 5 U.S.C. § 706(1) to challenge the unreasonable delay of her visa adjudication. Prior to filing suit, plaintiff requested information from the Department of Homeland Security, and its sub agency United States Citizenship and Immigration Service ("USCIS"). USCIS agency denied her request, and an appeal was filed. The agency has not complied with their statutory obligation to adjudicate the appeals within twenty business days. In addition to the unreasonable delay claim, plaintiff also include claims under the Freedom of Information Act ("FOIA") and seek production of documents.

**PARTIES**

1.      Sushma Bade is the dependent spouse of an H-1B visa holder and filed an application for extension of her H-4 status and an I-765 Employment Authorization Application on November 3, 2025. Plaintiff is over eighteen years of age and a national of India. Plaintiff has been lawfully admitted to the United States on a nonimmigrant visa. Plaintiff's H1B spouse has an approved Form I-140, Petition for an Immigrant Worker, which makes her eligible for an H4

Employment Authorization Document ("EAD"). Plaintiff Bade resides in Charlotte, North Carolina.

2.     Defendant is the United States Department of Homeland Security ("DHS") which is the parent agency of United States Citizenship and Immigration Service ("USCIS" or "Defendant"). DHS is an executive agency of the United States, and an "agency" within the meaning of the APA, 5 U.S.C. § 551(1).

## JURISDICTION AND VENUE

3.     This Court has subject-matter jurisdiction under 5 U.S.C. § 552 et seq. (FOIA) and 28 U.S.C. § 1331 (federal question). This Court has jurisdiction to grant declaratory, injunctive, and further necessary or proper relief pursuant to 28 U.S.C. §§ 2201–2202 (Declaratory Judgment Act).

4.     Plaintiff has standing to challenge the application of the IFR ending EAD automatic extension as applied to H4 visa holders.

5.     The United States has waived sovereign immunity over case challenging final agency actions, including rulemaking. 5 U.S.C. § 702.

6.     This Court has authority to vacate agency rules and regulations that are arbitrary and capricious, or created without compliance with law. 5 U.S.C. § 706.

7.     This Court also has power to compel agencies to take action that has been unreasonably delayed or unlawfully withheld. *Id.*

8.     Venue is proper in this district under 28 U.S.C. § 391(e)(1)(c) because Plaintiff maintains a residence in this district and no real property is involved in the action.

9.     Plaintiff is a H4 visa holder who hold legal immigration status and employment authorization by virtue of their spouse's approved immigrant visa petition.

3

10. Plaintiff Bade faces job loss since her EAD adjudication extended beyond her current EAD's validity period.

11. Plaintiff Bade has developed a reliance interest in the agency's promulgation of regulation enabling auto extension of EADs.

## LEGAL BACKGROUND

### I. History And Facts of H4 Ead Auto-Extension

12. Specified visa categories and nonimmigrant statuses are statutorily granted "employment incident to status," meaning the visa holder need not separately apply for an employment authorization document ("EAD").

13. Other visa categories or status are authorized to apply for an EAD by regulation. Employment authorization periods run concurrent with the status. Under the law in effect prior to 2022, these individuals would automatically lose employment authorization when the visa or status expired. This was the case even if timely applications to extend status and renew the EAD had been filed.

14. However, timely filed applications were nearly always adjudicated prior to loss of employment authorization.

15. In 2019 the administration changed processing rules that dramatically extended adjudication times and guaranteed that H4 visa holders would lose employment authorization.

16. In response to multiple lawsuits, including a class action, USCIS created an EAD auto extension regulation that prevented its processing delays from harming the H4's ability to maintain employment when an application to renew was filed prior to expiry.

17. On October 30, 2025, the administration rescinded the auto extension regulation through an interim final rule, without providing notice or opportunity to comment.

4

### A. The H4 Visa: Spouses of H1B Visa Holders

18. The spouse of an H1B visa holder is admitted to the U.S. on an H4 visa. H4 visa holders do not have employment authorization incident to status, meaning the statute creating the category did not expressly allow it. *Compare* 8 U.S.C. §§ 1101(a)(15)(H) (creating the H4 visa status) and 1184(c)(2)(E) (creating and granting L2 spouses employment authorization incident to status).

19. The H1B visa holder's duration of status is dictated by the dates requested on their employer's Form I-129, Petition for Nonimmigrant Worker. *See* 8 C.F.R. § 214.2(h)(14). Prior to filing the Form I-129, the employer must first obtain a Labor Conditions Application ("LCA"). The earliest an LCA may be filed is six months prior to the starting date of the requested visa. 20 C.F.R. § 655.730(b).

20. An H4 visa holder's maximum duration of status is inextricably tied to the validity of their H1B spouse's status. *See* 8 C.F.R. § 214.2(h)(9)(iv). Thus, an H4 visa holder's application to extend status is typically filed six months prior to expiry and in tandem with their spouse's employer's H1B extension petition.

21. Competition for H1B specialty occupation workers is fierce. Within the U.S. there are a limited number of new visas available each year which employers compete for. However, U.S. employers increasingly compete with companies in other countries for top talent.

22. As recently as November 12, 2025, President Trump reiterated that the U.S. did not have enough highly skilled professionals and relied heavily on the H1B program to fill these positions. https://thehill.com/homenews/administration/5601588-trump--visas-talent/ (Accessed November 14, 2025). Consequently, the ability to attract top international talent is a key factor to consider when making changes to regulations impacting the H1B program.

23.     Amongst our competitor nations, Canada, Australia, New Zealand, the United Kingdom, and Germany all grant employment authorization to dependent spouses of high skilled foreign workers. https://swecvisaconsultant.com/work-rights-for-dependents-on-a-visa-a-country-by-country-guide/#work-rights-for-dependents-in-other-countries (accessed November 6, 2025).

24.     The spouses of specialty occupation workers are typically highly educated with professional ambitions and achievements that often match or surpass their H1B spouses. The National Foundation for American Policy ("NFAP") analysis of data indicates that nearly 90% of H4 visa holders have at least a bachelor's degree, and almost half have a graduate or doctorate degree. https://nfap.com/wp-content/uploads/2022/11/H4-Visa-Holders.NFAP-Policy-Brief.2022-2.pdf (accessed November 6, 2025).

25.     Prior to February 25, 2015, there was no legal pathway for H4 visa holders to work in the United States. Thus, if the family decided to immigrate to the U.S., the H4 spouse would typically be unemployed for the twenty (20) plus year wait for the H1B spouse's immigrant visa to be current and eligible to apply for a green card.

26.     To address what it determined was a competitive disadvantage, the United States Citizenship and Immigration Service published a proposed rule to create an employment authorization category for H4 spouses. *Employment Authorization for Certain H4 Dependent Spouses*, 79 Fed. Reg. 26886 (May 12, 2014).

27.     The rationale for the proposed rule was that the nation's ability to recruit and retain high skilled talent via the H1B visa was hindered by the lack of employment authorization for their spouses. *Id.*

28. The published Final Rule reiterated the rationale supporting the regulation was the need to recruit and retain highly qualified workers. 80 Fed. Reg. 10288 (February 25, 2015).

29. H4 visa holders are now eligible to apply for an Employment Authorization Document ("EAD") when their H1B spouses have completed the initial steps for a permanent immigrant visa in the Employment-Based First, Second or Third Preference categories ("EB1," "EB2", and "EB3" respectively).

30. The H4 visa status and employment authorization require separate forms to be filed with different fees. H4 status is applied for on Form I-539, Application to Extend/Change Nonimmigrant Status. While the EAD is applied for on Form I-765, Application for Employment Authorization.

31. If an H4 visa holder makes a timely application to extend status they maintain that status until a decision is made on Form I-539.

32. However, under the 2015 regulations, the H4 visa holder could apply to renew their EAD withing 180 days of its expiry. However, if the agency did not complete its adjudication in that period the H4 visa holder would be required to stop working.

### 1. The Administration's Legacy of Bad Faith: Intentionally Creating Disruption in Employment Authorization.

33. The earliest H4 status extension and EAD renewals can be submitted to USCIS is 180 days prior to expiry[1]. However, for derivative beneficiary visas (like the H4), status extension application can only be applied to coincide with the primary spouses' status extension. Thus, if the primary spouse's employer delays an extension filing for business reasons (such as

---

[1] https://www.uscis.gov/green-card/green-card-processes-and-procedures/employment-authorization-document#:~:text=Renew%20an%20EAD,employment%20authorization%20and/or%20documentation. (accessed November 17, 2025).

evaluating business conditions and need for an employee's services) the derivative spouse's extension would be submitted with less than 180 days left on their status and EAD through no fault of their own.

34. Prior to 2019, status and EAD extension processing was a relatively short and predictable process. When the primary H1B, H4, and H4 EAD extensions were concurrently filed they were adjudicated at the same time. Given that much of the information required for these three adjudications was overlapping, concurrent adjudication was incredibly efficient.

35. As a result of this commonsense approach, prior to March 2019, there were no concerns about prolonged adjudications causing loss of employment[2]. Thus, those filing within 180 days of expiry rarely faced a lapse in employment authorization.

36. However, in the Spring 2018 USCIS published its Regulatory Agenda. Included therein was RIN: 1615-AC15, *Removing H4 Dependent Spouses from the Class of Aliens Eligible for Employment Authorization*. The proposed rule was sent to the Office of Management and Budget ("OMB") in February 2019.

37. Ultimately, the administration was unable to get its regulation to end H4 EADs through the regulatory process during the first Trump administration.

38. At the same time the regulatory agenda was updated to include elimination of the H4 EAD the administration also proposed changes to Form I-539, Application to Change or Extend Status. 83 Fed. Reg. 6874 (February 15, 2018)[3]. This notice had one reference to a new

---

[2] The only evidence needed to approve the H4 status is the marital relationship with an H1B who holds valid status. The criteria for the H4 EAD is limited to determining if valid H4 status exists and if the H1B spouse is the beneficiary of an immigrant visa petition.
[3] https://www.uscis.gov/archive/uscis-to-publish-revised-form-i-539-and-new-form-i-539a (accessed November 17, 2025).

8

biometric re-collection requirement. The agency allowed sixty (60) days for the public to comment on the change.

39. The key feature in the new Form I-539 was a requirement for applicants to provide new biometrics. It should be noted that H4 applicants had already provided biometrics at the U.S. consulate when applying for a visa, and again at the port of entry when being admitted to the U.S. *See* United States Visitor and Immigrant Status Indicator Technology Program ("US-VISIT"), 73 Fed. Reg. 77473 (December 19, 2008).

40. The basis for the new requirement was that the agency claimed it was unable to reuse previously collected biometrics. However, this was a false pretext.

41. The US-VISIT program began collecting biometrics and biographic information in 1994. The system coupled an immigrant's biographic information (name, address, birth date, residence, etc.) with their biometrics to create a unique user profile. *Id.* Thus, the biometrics and information collected at the U.S. consulate would be instantly compared to the biometric scan at the port of entry. If the biometrics matched, the identity was confirmed, and the immigrant would be admitted. *Id.*

42. The biometrics collected by the US-VISIT program are stored in the Automated Biometric Identification System ("IDENT"). *Id.* at 77480. This program shares and collects biometrics and user profiles with other government agencies, making them truly interoperable.

43. Interoperability was achieved following funding and a directive in the USA PATRIOT Act of 2001. Pub. Law 107-56, Section 403, and the Enhanced Border Security and Visa Entry Reform Act of 2002, Pub. Law 107-173, Section 302.

9

44.     DHS announced that the system "reduces the likelihood that another individual could assume the identity of an alien already recorded in US-VISIT or use an existing recorded identity to gain admission to the United States." *Id.*

45.     As of October 13, 2011, DHS and DOJ's identity management systems have been fully interoperable, with complete sharing of biometrics and identity profiles.

46.     However, in a March 1, 2019, teleconference with stakeholders, the administration claimed, without explanation, that new biometrics were required to "combat human trafficking, child sex trafficking, forced labor exploitation, and alien smuggling[4]."  The administration conceded that:

> The Department of State fingerprints nonimmigrants when issuing a visa, and U.S. Customs and Border Protection (CBP) fingerprints nonimmigrants when entering the United States. In both cases, USCIS may not have access to all of the results of those fingerprint-based background checks.
>
> Furthermore, *we cannot use either of these earlier fingerprint collections, even if available*, without first conducting a biometric-based identity verification prior to submission of fingerprints to the Federal Bureau of Investigation (FBI).

*Id.*

47.     The administration argued that "managing identity" would be impossible without new biometric collections. *Id.* at Pg. 4. The administration claimed that USCIS lacked the technological ability to re-use biometrics collected at U.S. consulates during visa interviews or by Customs and Border Protection at the port of entry.

48.     However, this explanation was contradicted by a long statutory and regulatory history establishing all these agencies' biometric and identity management systems were interoperable.

---

[4] Page 3, https://www.uscis.gov/sites/default/files/document/outreach-engagements/USCIS_Teleconference_on_Revised_Form_I-539_and_New_Form_I-539A.pdf (Accessed November 18, 2025).

10

49. Simply put, the re-collection of biometrics from H4 applicants was a pretext used to grind EAD processing to a near standstill.

50. Not only was the rationale for the change demonstrably false, the agency made it nearly impossible to get an appointment for new biometrics. In essence, the administration accomplished the goal of its draft regulation, eliminating H4 EADs.

51. From March 2019 forward, the agency replaced *concurrent* adjudications of the H-1B, H4, and H4 EAD, which were all performed by the same adjudicator, with a *sequential* process. Only after the H-1B was adjudicated would the agency assign a new adjudicator to process the H4 Form I-539 (after biometrics had been recollected), and after that was favorably decided the Form I-765 EAD would be placed in queue for adjudication.

52. What had been a predictable experience with little disruption suddenly turned into a train wreck. Massive adjudication delays pushed H4 EAD holders out of work, many of which were idle for over a year. Not only did this impact the H4s' families and personal career progress, but it also left their employers with unanticipated and unfillable gaps.

53. By 2021, H4 Form I-539 processing times ballooned to over 10 months. Processing times for H4 EADs increased to an additional 7.5-10 months by May of 2021.

54. Even those families fortunate enough to have employers file petitions 180 days prior to expiry would be without employment authorization for a prolonged period. This cycle repeated with the next status extension and EAD renewal.

55. While the administration was unable to promulgate the regulations ending H4 EADs legally, it accomplished the same end by creating processing burdens, and pretextual biometric collections. The process the administration put in place guaranteed that every H4 EAD holder would lose employment authorization, and as a result lose their jobs.

11

## 2. Litigation, Ceasing Biometric Re-collection, and Creation of Auto Extension of EADs Pending Renewal

56. Not surprisingly, when faced with a yearlong delay in EAD adjudication, H4s and similarly impacted nonimmigrants took to the courts *en masse*, filing thousands of mandamus lawsuits across the country.

57. In 2022, the agency settled a class action lawsuit, *Edakunni v. Mayorkas*, that challenged the unlawful and intentional delay of EAD adjudications. To resolve that case, the agency agreed to suspend the unnecessary re-collection of biometrics prior to processing Forms I-539 and return to concurrent processing of primary and derivative beneficiary applications.

58. Along with that settlement, the agency also released a Temporary Final Rule ("TFR") that dictated certain EAD holders who had filed a renewal application in the same category were given up to 540-days of EAD auto extension. *Temporary Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Renewal Applicants*. 87 Fed. Reg. 26614 (May 4, 2022). This TFR applied in part to EAD Category C24 (H4s). *Id.* at 26616-26617.

59. The 2022 TFR was extended in April 2024. *See* 89 Fed. Reg. 24628, 24630 (Apr. 8, 2024). The agency estimated that the initial TFR had prevented 800,000 EAD holders from losing employment authorization. *Id.*

60. The auto extension process was made permanent and promulgated in *Increase of the Automatic Extension Period of Employment Authorization and Documentation for Certain Employment Authorization Document Renewal Applicants*, 89 Fed. Reg. 101208 (December 13, 2024). By the agency's own admission:

> The 2022 TFR proved to be very successful at minimizing disruption to renewal
> EAD applicants and their U.S. employers that would have otherwise resulted from
> USCIS processing delays. Not only did the 2022 TFR immediately restore

12

employment authorization and EAD validity for approximately 70,000 renewal EAD applicants who were already beyond the up to 180-day automatic extension period when the 2022 TFR published, but the 2022 TFR also helped nearly 280,000 renewal EAD applicants avoid a gap in employment authorization and/or employment authorization documentation based on applications filed on or after May 4, 2022, and on or before October 26, 2023.

89 Fed. Reg. 101215.

### 3. Publication of the IFR Ending Auto Extension.

61. On October 30, 2025, USCIS published an Interim Final Rule, effective upon publication, which ended EAD auto extension. *Removal of the Automatic Extension of Employment Authorization Documents*, 90 Fed. Reg. 48700 (October 30, 2025).

62. According to the administration, while it is not a threat to national security to allow H4s to remain in the U.S. pending a status extension application, allowing H4s to maintain employment is an existential threat to the country. *See id.* at 48806 ("Without this IFR, aliens could still obtain an automatic extension despite derogatory information that could flag them as a national security or public safety risk.").

63. The administration also dusted off its first term's play book. On November 3, 2025, it published a Notice of Proposed Rulemaking, Collection and Use of Biometrics by U.S. Citizenship and Immigration Services, Document ID USCIS-2025-0205-0002. https://www.regulations.gov/document/USCIS-2025-0205-0002 (accessed November 18, 2025). The unnecessary biometric recollection requirement will once again cause bottlenecks for ASC appointments, leading to substantial delays in adjudication.

64. Not coincidentally, the agency seeks to end auto extension of EADs at the same time it requires biometric recollection.

13

65. The IFR is high on platitudinal invocations of national security concerns, but exceeding low on a factual predicate showing a threat exists, or that the IFR will address the threat.

66. Indeed, the only factual support listed for the national security claims is a non sequitur: an individual in the U.S. pursuant to a lawful status threw a Molotov cocktail at a pro Palestine rally, while his status extension and EAD renewal were pending. *Id.* at 48808.

67. The analysis of the IFR does not explain the nexus between the Molotov cocktail and the EAD's auto extension. Afterall, even if EAD auto extension was not available, the cocktail thrower would have still been legally in the country and able to attend the event and commit the offense.

68. The administration stated that it recognizes the differences in eligibility for status between EAD categories, implying some may have less certain security threats than others. *Id. at* 48807. Yet, it made no effort to explain those differences. The administration's failed to differentiate between an H4 visa holder who have been in the U.S. for a decade, and subject to persistent security checks, and individuals attempting to obtain lawful status from war torn countries whose identity is possibly in doubt. Instead, the administration lumped all visa categories into the same pile, considering them all to be security threats. *Id.*

69. The administration published the IFR, and made it immediately effective, by invoking the good cause exception to notice and comment rulemaking. *Id.* at 48812. The basis for this short cut was "public safety."

70. The legal support for its good cause exception included cases where: emergency airline regulations created in the wake of an actual terror plot against airlines, *Jifry v. FAA*, 370 F.3d 1174, 1179–90 (D.C. Cir. 2004); a regulation promulgated shortly after the beginning of

14

hurricane season after a particularly violent storm with more predicted to make landfall, *Cty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 719–20 (D.C. Cir. 2021) (per curiam).

71. In contrast to the cases cited by the IFR where good cause was found, this case has no unforeseen or antecedent crisis requiring emergency remedies.

72. The administration's true rationale, stripping the ability of people lawfully in the U.S. of the ability to sustain themselves, is embarrassingly obvious.

### 4. The Purported Justification for the IFR is False

73. The administration contends that automatic extensions of employment authorization are a national security and public safety vulnerability because they grant significant immigration benefits to individuals before DHS can perform the necessary vetting and screening on those individuals.

74. More precisely, EAD auto extension "grants the benefit without an eligibility determination; without completing vetting and screening checks; without resolving potential hits of derogatory information; and, when applicable, without a determination that the employment authorization should be granted in the exercise of discretion." 90 Fed. Reg. 48806.

75. This conjures up a process where an individual's eligibility, criminality, or other national security threat is only evaluated when adjudicating a benefit request.

76. In portraying the process in this manner the agency intentionally misrepresents the process.

77. In fact, DHS developed and employed the capacity to screen and vet individuals *continuously* via the ATLAS system and the Continuous Immigration Vetting ("CIV") programs which are not discussed in the IFR.

15

78. As early as 2015, DHS has been building and expanding its ability to perform continuous automated vetting.

79. The continuous automated vetting system monitors, screens and vets foreign nationals in the United States without waiting for a new benefit request adjudication.

80. The system is not limited to the point-in-time process described by the IFR that is initiated only by the filing of a request for an immigration benefit.

81. A 2016 DHS Privacy Impact Assessment describes the capability of an electronic system called ATLAS to perform both point-in-time checks initiated by agency users as well as conduct automated checks, where new information that pertains to an alien in agency systems automatically triggers a "hit" which is sent to the agency for investigation and resolution. DHS FDNS-DS PIA, Page 3, May 18, 2016. That is, anytime derogatory information about an individual appears in a system that is monitored, the agency is alerted and able to perform the appropriate actions.

82. In 2019, DHS explained the CIV system vets individuals on an ongoing basis. CIV vets:

> information from certain immigration benefit applications throughout the entire application adjudication period as new information is received, rather than only performing point-in-time checks, to further enhance the agency's ability to identify national security concerns. CIV is an event-based vetting tool that automates and streamlines the process of notifying USCIS of potential derogatory information in Government databases that may relate to individuals in USCIS systems, as new information is discovered. USCIS is now incrementally expanding CIV to encompass screening and vetting immigrant and nonimmigrant applications and petitions throughout the duration of the benefit or status, until the individual becomes a naturalized U.S. Citizen."

DHS Continuous Vetting PIA, Page 1, February 4, 2019.

83. Contrary to the system described in the IFR, ATLAS system and CIV work together to support a screening and vetting process. According to a Privacy Impact Assessment

16

dated December 30, 2020, CIV creates a "hit" in the system if it finds new information that meets a set of agency-defined criteria related to a foreign national. Agency staff called "Gatekeepers" are notified of the hit immediately. Gatekeepers then determine if the information pertains to the individual and if the information warrants action. If so, the information is referred to the appropriate personnel, to adjudicators for consideration in pending decisions or to others for actions pertaining to individuals who have been previously approved (such as referral to Immigration and Customs Enforcement or other actions). DHS ATLAS PIA, Pages 6-7, December 30, 2020.

84. In 2019, the agency announced it would use CIV for all individuals from their first entry as a nonimmigrant through citizenship, noting that those applying for citizenship and lawful permanent residence are already subject to CIV. DHS Continuous Vetting PIA, Pages 3, and 6, February 14, 2019.

85. The IFR ending EAD auto extension listed two alternative actions considered by DHS. First, eliminating the 540-day automatic extension period and returning to the prior 180-day automatic extension period. Second, was delaying the effective date of this change.

86. DHS found both alternatives unsatisfactory, as either option did not address the national security and public safety risks associated with the vulnerabilities described in the IFR.

87. The administration argued that due to lack of point-in-time vetting, a "security vulnerability that could allow bad actors to continue to work and generate income to potentially finance nefarious activities that pose an imminent threat to the American public." IFR 48810.

88. Nowhere in the IFR does the administration discuss the capabilities of ATLAS and CIV and the impact they have on vetting national security concerns.

## FACTS

I. **Plaintiff Sushma Bade's Factual Allegations**

17

89. Plaintiff Sushma Bade is the dependent spouse of an H-1B nonimmigrant visa holder and currently holds H-4 status valid through August 12, 2028. Plaintiff has been married since April 29, 2018, and resides in Charlotte, North Carolina, with her spouse.

90. Plaintiff Bade has been lawfully admitted to the United States on a H4 visa. Her H-1B spouse is the beneficiary of an approved Form I-140, Immigrant Petition for Alien Worker, which makes Plaintiff eligible for an H-4 Employment Authorization Document ("EAD").

91. Plaintiff Bade first entered the U.S. on an H4 visa on July 6, 2018.

92. Plaintiff Bade has complied with all the laws of the United States, including immigration laws.

93. Plaintiff Bade has also diligently worked to maintain their employment authorization to prevent gaps in employment.

94. Plaintiff applied for extension of her H4 status on September 18, 2025, via online with the receipt number MCT2571277747.

95. On November 3, 2025, Plaintiff Bade submitted a request to invalidate the previous online application and created a bundle application for H4 and EAD together.

96. USCIS assigned receipt numbers WAC2690017898 and WAC2690017897 for the H-4 visa application and I-765, Employment Authorization Application, respectively.

97. On January 12, 2026, Plaintiff Bade received a Request for Evidence ("RFE") requesting proof of a valid passport. Plaintiff promptly submitted a copy of the requested documentation.

98. Despite having been vetted prior to approving her H4 status extension, no action has been taken on the application to renew the EAD.

18

99. Plaintiff Bade was employed as an IT engineer, Full Stack Java developer at Department of Human Services for the State of Maryland. In this role, Ms. Bade provided code and solutions for the CJAMS applications and worked with the team in building a strong automated platform for various activities done under Child Welfare and Provider teams of CJAMS, DHS, Maryland.

100. Without Ms. Bade's continued contributions, The Maryland Department of Human Services will experience project delays, reduced quality of deliverables, system instability, and significant knowledge gaps. Her work is instrumental in maintaining project momentum and ensuring the successful and timely delivery of key initiatives.

101. On February 11, 2026, Plaintiff Bade submitted an expedited service request via USCIS. No response ever came.

102. On March 23, 2026, Plaintiff Bade requested an expedite via USCIS Customer Care, Emma, and was told the agency would contact her. No response ever came.

## II. Plaintiff Bade's FOIA Factual Allegations

102. Pursuant to a nationwide permanent injunction, Defendant USCIS must cease violating FOIA's statutory deadlines in 5 U.S.C. § 552(a)(6)(A) and (B), which require determinations within 20 business days or, in the case of "unusual circumstances," within 30 business days, respectively. *See Nightingale v. USCIS*, 507 F. Supp. 3d 1193 (N.D. Cal. 2020).

103. On April 22, 2026, Plaintiff Bade submitted a FOIA Request to Defendant USCIS through FOIA FIRST, USCIS' online web portal requesting H-4 applications processing data.

104. On April 26, 2026, Defendant responded to the FOIA request. Defendant responded to the request stating: "We have completed our search and no records responsive to your request were located."

19

105. Plaintiff Bade, through counsel, filed an administrative appeal challenging the decision.

106. USCIS assigned appeal case number APP2026013726REQ . The status of the appeal is "The request was received by USCIS".

**<u>LEGAL AUTHORITIES</u>**

105. Title 5, Section 553 requires agencies to provide notice of proposed rules and an opportunity to respond prior to the rule taking legal effect. *See Paulsen v. Daniels*, 413 F.3d 999, 1005 (9th Cir. 2005) ("It is antithetical to the structure and purpose of the APA for an agency to implement a rule first and then seek comment later.").

106. In exceptional circumstances § 553(b) allows an agency to invoke a "good cause" exception to the required notice and comment process.

107. The D.C. Circuit has noted that "an agency may invoke the good cause exception *if providing notice and comment would be contrary to the public interest*." *Mack Trucks, Inc. v. EPA*, 682 F.3d 87, 94 (D.C.C. 2011) (emphasis added).

108. The Fifth Circuit has limited the good cause exception to "emergency situations." *Nat'l Horsemen's Benevolent & Protective Ass'n v. Black*, 53 F.4th 869, 883 (5th Cir. 2022).

109. One court in this circuit noted the long line of cases describing the "good cause exception" to be "meticulous and demanding, narrowly construed, reluctantly countenanced, and evoked only in emergency situations. Based upon this stringent standard, the good cause exception is rarely upheld." *Louisiana v. Ctrs. for Disease Control & Prevention*, 603 F. Supp. 3d 406, 436 (W.D. La. 2022).

110. Theoretical harms are insufficient to meet this burden. *See E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1253 (9th Cir. 2018) (the agency's speculation that notice

20

Case 3:26-cv-00436    Document 1    Filed 06/03/26    Page 20 of 26

would incentivize illegal border crossings prior to final promulgation was insufficient to meet the good cause standard).

111. When evaluating a challenge to the good cause exception courts require the administrative record to show "rational justification" and identify "rational connection between the facts found and the choice made to promulgate the interim rule" *California v. Azar*, 911 F.3d 558, 577 (9th Cir. 2018) (internal quotation marks and citation omitted) quoting *Valverde*, 628 at 1165, 1168.

112. When evaluating the substance or merits of a rule courts also require the agency prove a "rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins*. Co., 463 U.S. 29, 43 (1983). This requires the agency to give "adequate reasons for its decisions" and to "examine the relevant data." *Id.*

113. Courts will vacate regulations where the agency "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Texas Oil & Gas Ass'n v. EPA*, 161 F.3d 923, 933 (5th Cir.1998) (citing *Motor Vehicle Mfrs. Assn. v. State Farm Mut*., 463 U.S. 29, 43, 103 S. Ct. 2856, 77 L. Ed. 2d 443 (1983)).

114. An agency's "predictive judgments about the likely [] effects of a rule are entitled to deference, deference to such judgments must be based on some logic and evidence, not sheer speculation." *City & Cty. of S.F. v. United States Citizenship & Immigration Servs*., 408 F. Supp. 3d 1057, 1109 (N.D. Cal 2019), quoting *Sorenson Commc'ns Inc. v. F.C.C.,* 755 F.3d 702, 708, 410 U.S. App. D.C. 278 (D.C. Cir. 2014).When, in cases like this, the agency does an about face and promulgates a rule that completely contradicts a prior regulation heightened standards are

applied. *See Encino Motorcars, LLC v. Navarro,* 136 S. Ct. 2117, 2125, 195 L. Ed. 2d 382 (2016), and *FCC v. Fox Television Stations, Inc.,* 556 U.S. 502, 129 S. Ct. 1800, 173 L. Ed. 2d 738 (2009).

115.    The Northern District of California has noted that "[w]ith regard to the "good reasons" requirement, *Fox* makes clear that when an agency seeks to disregard facts underlying the original rule, it must provide 'a more detailed justification than what would suffice for new policy created on a blank slate.' 556 U.S. at 515. *California v. United States DOI*, 381 F. Supp. 3d 1153, 1165 (N.D. Cal. 2019).

116.    When abandoning a rule, the agency is required to acknowledge reliance interests created by the prior rule. *See Tri-Cty. Tel. Ass'n, Inc. v. FCC*, 999 F.3d 714, 719–20 (D.C. Cir. 2021) (per curiam). A rule that ignores these interests would be arbitrary and capricious. *Id.,* accord *Encino Motorcars*, 579 U.S. at 221-22.

117.    When reliance interests are at issue, a "reasoned explanation is needed' for disregarding the interests 'engendered by the prior policy" is required. *Fox*, 556 U.S. at 515.

118.    As part of rulemaking the agency must "assess whether there were reliance interests" in the prior rule, determine whether those interests "were significant," and weigh them "against competing policy concerns." *Department of Homeland Sec. v. Regents of the Univ. of Cal*., 140 S. Ct. 1891, 1915, 207 L. Ed. 2d 353 (2020).

<u>**COUNT I**</u>
**Violation of the Administrative Procedure Act.**

119.    This Court should vacate the IFR pursuant to 5 U.S.C. § 706 because it has two fatal flaws.

120.    First, the agency's invocation of the good cause exception is without merit.

121. The IFR does not meet the "high bar" of the good cause exception because administrative record lacks any evidence of a "real harm." *See Valverde,* 628 F.3d at 1164-1165.

122. Instead, the IFR recites speculative or theoretical harms, such as an immigrant on an EAD auto extension could possibly donate money to a terrorist organization. *See California v. Azar*, 911 F.3d at 577.

123. Likewise, the administration fails to show a connection between facts and the interim rule. *California v. Azar*, 911 F.3d at 577. Here, the only fact the agency relies on is one individual committed violence while his EAD was automatically extended. However, the agency does not provide facts or analysis that even hints at a causal connection between the two. The mere possibility that a solitary member of an otherwise law-abiding group would donate funds to support a terrorist organization lacks any factual support.

124. Thus, the IFR is not supported by "logic and evidence," but hangs on a thread of "sheer speculation." *See Sorenson Commc'ns Inc. v. F.C.C.*, 755 F.3d at 708. The agency, though its extensive vetting process, possesses a trove of data showing potential connections between foreign nationals and crime and terrorism. However, it produced no data establishing a legitimate link, let alone a connection between national security and EAD auto extension.

125. Second, the IFR is terminally flawed on the merits. The administration is required to consider the important aspects of the problem it seeks to impact through regulation. *State Farm Mut. Auto. Ins. Co.*, 463 U.S. at 43. Here, the only important aspect of the problem was whether the agency could properly vet individuals prior to awarding benefits. The agency described a point in time vetting process performed during a benefit adjudication. However, the agency wholly failed to consider the ATLAS and CIV process that monitors and hits records in real time.

23

126. The agency did not address the impact of the IFR on competing policy objectives. *See DHS v. Regents of the Univ. of Cal.,* 140 S. Ct. at 1915. The H4 EAD was created to incentivize and attract specialty occupation workers to come to the US. Among the important factors the agency ignored is the impact its IFR would have on H4s and, more importantly, their families' decisions to come and stay in the United States. Loss of EAD auto extension precedes the agency's extended processing delays and loss of H4 jobs.

127. The stated reason for the IFR is that the providing a benefit to unvetted individuals could lead to erroneous approvals. In the case of Plaintiff Pakalapati her H4 status vetting has already been completed. The agency's delay in processing her EAD exposes the façade presented by the IFR and underscores that this rulemaking was done with the intent of harming EAD holders and their ability to work.

128. Nor does the IFR address the reliance interest H4s have in the EAD auto extension. H4s have decided to come to the U.S., start business, and incur financial obligations. All these decisions were predicated on continuity of employment allowed by EAD auto extension.

129. This Court should vacate the IFR because it did not establish "good cause," and because the merits of the IFR are arbitrary and capricious.

### COUNT II
**The agency has unreasonably delayed adjudication of EAD renewals.**

130. Plaintiff incorporates by reference the allegations above as if fully restated here.

131. The agency is unreasonably delaying adjudication of Plaintiff's EAD renewals. *See Telecommunications Research & Action Ctr. v. FCC ("TRAC")*, 750 F.2d 70, 80 (D.C. Cir. 1984). *Id.* at 80. Each TRAC factor favors a finding that the Agency's delay is unreasonable. *Id*.

24

132. The agency lacks a rule of reason by which its timing of adjudications is performed.

133. The agency claims its highest priority is ensuring eligible applicants are vetted prior to being awarded a benefit. When viewing Plaintiff's case the agency's rationale falls apart. She has already been vetted, and been granted a status extension, yet the agency has taken no action on her case.

134. The benefit the agency is intentionally delaying is the ability to work, not the ability to lawfully stay in the U.S. The IFR is premised upon an urgent need to vet applicants' status and eligibility before awarding them a benefit. Yet, the agency displays no urgency in performing vetting that would result in inadmissible immigrants being forced to leave the country.

135. The stated justification for the IFR causing delays to EADs is that vetting must occur. However, the agency has already vetted every applicant in real time. The agency makes no mention of its expansive CIV and ATLAS programs, as these would contradict the agency's case for the rule.

136. The real reason for the delays is the administration's bad faith attempt to prevent eligible individuals from working in the U.S. Delays caused by bad faith are per se unreasonable.

## COUNT III
### Defendant USCIS has failed to comply with the statutory deadline.

137. Title 5, Section 552(a)(6)(A)(i) requires federal agencies to provide relevant documents within twenty business days of a request for production.

138. In the event of an adverse decision the applicant may appeal. At which point the agency has an additional twenty business days to respond.

139. Here plaintiff has filed an appeal of USCIS's initial denial.

25

140. Plaintiff has exhausted her administrative remedies.

141. This Court should order the agency to produce responsive records in accordance with Plaintiff's FOIA request.

## **PRAYER FOR RELIEF**

Wherefore, in view of the above authority, Plaintiff prays the Court:

A. Takes jurisdiction over this matter;

B. Sets aside and vacates DHS's IFR promulgated at 90 Fed. Reg. 48799;

C. Order the agency to make a decision on Plaintiff's EAD renewal within 30 days;

D. Grant all other relief that is necessary and proper to restore Plaintiff to the position she was in prior to the unlawful determinations of DHS; and,

E. Award Plaintiff attorney's fees under the Equal Access to Justice Act.

Dated: June 3, 2026,                                    Respectfully submitted,


*s/ Helen L. Parsonage*
Helen L. Parsonage
NC Bar Number 35492
Attorney for the Plaintiff
Elliot Morgan Parsonage PLLC
328 N Spring Street
Winston-Salem, NC 27101
Phone: (336)714-4480
Email: hparsonage@emplawfirm.com

*/s/ Jonathan D. Wasden*
Jonathan D. Wasden
DDC MS0011
Wasden Law
2593 W Torana Dr
Meridian, ID 83646
Phone: (843)872-4978
Email: jon@wasden.law
*Pro Hac Vice Application forthcoming*

Attorneys for the Plaintiff

26